# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00551-CV

**Nicholas Vincent Russo, Appellant**

**v.**

**Maria Camila Bernal, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY, NO. C-1-CV-17-001153, HONORABLE MIKE DENTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Nicholas Vincent Russo challenges a lifetime protective order entered in favor of Maria Camila Bernal under Chapter 7A of the Texas Code of Criminal Procedure, which allows a trial court to issue a protective order in favor of a person that the trial court has "reasonable grounds" to believe is the victim of stalking. Bernal, through the Travis County County Attorney's Office, sought the protective order in response to Russo's actions over a three-year period from 2014 to 2017. After an evidentiary hearing, the trial court issued the protective order, which orders Russo, stated generally, to refrain from threatening or committing violence against Bernal; communicating or attempting to communicate with Bernal in any manner; engaging in conduct directed toward Bernal that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass Bernal; stalking

Bernal; and going within 200 yards of Bernal. On appeal, Russo challenges the legal sufficiency of the evidence supporting the protective order.[1] We affirm.

## Statutory Background

The Code of Criminal Procedure grants a trial court the authority to issue a protective order if the applicant is the victim of certain crimes, including stalking. *See* Tex. Code Crim. Proc. arts. 7A.01(a)(1), 7A.03. Under the Penal Code, a person commits the offense of stalking if, as relevant here:

> the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:
>
> (1)      constitutes an offense under Section 42.07 [the harassment statute], or that the actor knows or reasonably should know the other person will regarding as threatening: . . . bodily injury or death for the other person; . . . or . . . that an offense will be committed against the other person's property;
>
> (2)      causes the other person . . . to be placed in fear of bodily injury or death . . . or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
>
> (3)      would cause a reasonable person to . . . fear bodily injury or death for . . . herself; . . . or feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

Tex. Penal Code § 42.072(a).

The reference to Section 42.07 is to the "harassment" statute. A person harasses another if, "with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person,"

---

[1] Although Russo characterizes his appeal as challenging both the legal and factual sufficiency of the evidence, he argues that there is "no evidence" or "not a scintilla of evidence" to support the protective order, which are legal-sufficiency challenges.

relevant here, "sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." *Id.* § 42.07(a)(7).

Before issuing a permanent protective order, the trial court must hold a hearing to determine "whether there are reasonable grounds to believe that the applicant is the victim of . . . stalking . . . ." Tex. Code Crim. Proc. art. 7A.03(a).

### Trial Court Proceedings

Bernal and three other witnesses, not including Russo, testified at trial about Russo's conduct relating to Bernal. The following is a chronological summary of events based on that testimony and other evidence admitted into the record.

**2014**

- Bernal and Russo met while they were working together at a television station in Midland, Texas.

- Russo told Bernal that he had feelings for her. Bernal informed him that she was not interested in having a relationship with him and that she was in Midland to focus on her career and he should do the same.

- Russo left "Peeps" brand candy with a letter on Bernal's desk after hearing Bernal tell a coworker that she really liked "Peeps."

- Russo "liked" some of Bernal's very old Facebook posts, which Bernal found "very strange."

- Russo treated Bernal differently than other co-workers—for example, at times when she was in the newsroom with other coworkers Russo would come in and say hello only to Bernal. The other coworkers noticed and commented on Russo's ignoring them.

- Russo would lean in and try to listen to Bernal's conversations with other work colleagues.

- Russo sent Bernal a Christmas card stating that Bernal "was the best thing that had happened to him." Bernal responded by telling Russo that she was not interested in a relationship with him and that he should just focus on himself.

3

**2015**

- After Russo fell and injured himself, he texted Bernal asking her to come and help him and support him while he was in the hospital. Bernal responded to Russo, "I am willing to help you but you need to understand that I am not interested in you and I do not like you, but I'm willing to go help you if that is what you need." Bernal took a group of people with her to the hospital to see Russo.

- Russo asked Bernal if he could come to her apartment to thank her for her help when he was in the hospital. Bernal told him no and reminded him that she had told him that her coming to the hospital did not mean that she liked him or that she would ever like him.

- After Russo met one of Bernal's church friends and asked the friend how she knew Bernal, Russo began attending the same church as Bernal.

- Bernal received a job offer from a television station in Arkansas. While she was deciding whether to accept the offer, Russo posted on his Facebook page that "it was going to be very hard to say goodbye to someone."

- Bernal told her employer that she was uncomfortable with Russo's behavior and did not want to be alone with him. Bernal's only option was to file a sexual-harassment report with human resources, but Bernal wanted to warn Russo before she did so. Russo asked Bernal whether she was going to accept the Arkansas position. When Bernal said no, Russo jumped up in the air and said, "Woo hoo!" Bernal again told him that she didn't like him, that she did not want anything to do with him, that he was making her uncomfortable, and that if he continued, she would file a report with their employer. Russo responded by telling Bernal that she reminded him of his mother because she spoke two different languages and liked to travel. He also told her that it would be "really hard to not be friends with you," but that he was "going to try." Bernal was shocked by and uncomfortable with Russo's response.

- Russo told witness Kierra Powell, a friend of both Russo's and Bernal's, that Bernal was "the one" for him on more than one occasion. He also told Powell that he had gone to a mental hospital because he wanted to hurt himself over his feelings for Bernal.

- Bernal had a birthday party in early February that Russo was not invited to attend. On the day of the party and during the party, Russo posted a video on social media of himself angrily throwing objects at a wall and made a comment about wanting to kill himself. Someone at Bernal's party called 911 to report Russo's post. Russo later posted that the police had come to his house, but that he got them to leave and he could still kill himself.

4

- Bernal blocked Russo from her personal social-media accounts, but she could not block him from viewing her public reporter page and account, which included information about her job and location.

- In February, Bernal filed a complaint about Russo with her employer, providing documentation of her interactions with Russo. Russo was absent from work for approximately two weeks after Bernal filed her report. Russo resigned soon after and told someone that he resigned because he could not follow the guidelines that human resources required him to follow regarding Bernal.

- Russo posted on his Facebook page that he wanted to learn Spanish. Someone showed the post to Bernal, who thought that he was learning Spanish because of her.

- In August, Bernal moved to Austin to begin working for the CBS affiliate and Telemundo.

- Russo began following Bernal's employer's and coworkers' social-media accounts, liking and sharing posts related to Bernal.

- In October, Russo posted on Facebook that he would "never give up on the only thing that I truly care about. . . . I haven't been truly happy since February . . . . My frustration and disappointment fuels me. It drives me to work harder. . . . I hope that one day I will finally get my happiness back. I may never be happy again, but I will not give up hope, and I will not give up trying."

**2016**

- Russo texted and called Powell about Bernal's new employment. In a voicemail message he left for Powell, Russo, who is crying and agitated, states that Bernal means the world to him, that counselors don't understand how he feels about her, and that he doesn't want to end up in the mental hospital again. Powell forwarded the voicemail to Bernal. Russo later told Powell that he "had feelings" for Bernal, was very depressed, and was not able to get past it.

- Russo changed his Facebook profile picture to a picture of himself and Bernal that had been taken by their previous employer.

- Russo posted on his Facebook account that he was interested in speaking Spanish. Bernal felt that this post was directed at her because of a previous conversation they had where Russo told her he appreciated the fact that she spoke both Spanish and English.

- Russo posted on his Facebook page: "Today is my first day off in 2 weeks. It's no wonder I broke down in tears twice for 30 minutes this weekend. [crying emoticon] I miss her so much . . . the only person besides my family who I ever truly loved. She was the light of my

life. The last 1.5 years of my life have been full of darkness without her. No matter how hard I try to be positive and optimistic, my life isn't the same. Nothing else really matters to me. . . . the only thing I really care about is love. [two heart emoticons]." Bernal believes that this post was referring to her because Russo told her several times that she is the only person he has loved and cares about, and also because the timeline matches.

- Russo posted on Telemundo's social-media page in Spanish that Bernal is a good anchor. He "liked" various posts by her employer that were related to Bernal.

- Russo shared a picture of Bernal and a radio personality that was on Bernal's public Facebook page, referring to them in Spanish as his "Latino friends."

- Russo and Bernal had the following text exchange after Russo sent Bernal a text regarding a possible story she could report:

> Bernal: Nick, I am not your friend, you make me uncomfortable, I don't like you—and I never will. Please stop stalking me, stop sharing my social media things—there is a reason why I blocked you. Just stop.
>
> Russo: I'm sorry you feel that way. I'm not trying to make you uncomfortable, I've just been upset about everything that happened and I'm trying to make it up to you.
>
> Bernal: The best way you can make it up to me is BY LEAVING ME ALONE. And please don't ever contact me again. EVER.
>
> Russo: I'm not a bad person Camila. Just like I said the day I resigned, I have my flaws. But if that's what you want I will try my best. I hope you have an amazing, happy life. I wish the best for you.

- Russo texted the following to Powell:

> I love her more than I love anything else, I mean that. I thought a lot about what you said that I put her on a pedestal and she's really not that great, but I don't believe that. She's the funniest, most ambitious and beautiful person I have ever met. All I have ever wanted is for her to be happy with me. If she doesn't want me to talk to her fine, but I will never give up hope that there will be a miracle and she will come around to having feelings for me someday. Hope is the only thing that has kept me going the last two years and the only thing that keeps me going at this moment.

6

Powell asked Russo if he had a girlfriend. Russo said that he did, but that he should probably break up with her because it was all a lie and he didn't have any feelings for her, that when he kisses her all he thinks about is Bernal. Russo also told Powell that he only learned Spanish because of Bernal.

• Russo changed his Facebook profile picture to another picture of himself with Bernal. The picture had been taken by their employer in 2014, but the original version of the picture had a third person that was cropped out of the picture posted on Russo's Facebook page.

**2017**

• Russo posted on Facebook that he had broken up with his girlfriend and "[t]he one thing being in a relationship confirmed to me is that—the only woman I'll ever love is in Texas, not Michigan. She's the only person who can make me truly happy. I miss her everyday. I can't let go of hope for a future with her. If I can't be with her right now, it's best that I'm single." A third person showed this post to Bernal.

• Russo traveled to Austin, Texas in January to tour the television station where Bernal worked, in connection with obtaining a job there.

• While in Austin, Russo approached one of Bernal's colleagues at a restaurant, introduced himself, and told the colleague that he was in Austin trying to get a job at the CBS affiliate.

• The U.S. Marshals office asked the Austin Police Department to investigate a possible stalking case involving Bernal. An APD Officer interviewed Russo and during the interview Russo stated that wanted to get a job at Bernal's workplace so that he could show her that he was a different person now than he was when they worked together in Midland. Russo also told the officer that Bernal "is the only woman for him" and that, although he had met many women, he has not met any woman "that gives him feelings like the way [Bernal] does." He also acknowledged that Bernal did not reciprocate his feelings and that she told him that she did not want a romantic relationship with him.

• The officer told Russo to not communicate with Bernal and to look for someone else to date. Russo asked the officer if he could contact Bernal after three or five years if he could not find someone who gives him the same feelings as Bernal. The officer had concerns for Bernal's safety after interviewing Russo.

In addition to the foregoing, Bernal testified that she is afraid of Russo because of his actions between 2014 and 2017 and that she needed a protective order to keep her safe. The APD officer, as noted, testified that he had concerns for Bernal's safety after he interviewed Russo.

7

After considering the evidence, the trial court issued a lifetime protective order against Russo.

## Discussion

On appeal, Russo challenges the legal sufficiency of the evidence supporting the protective order. Specifically, Russo argues that the State failed to present any evidence that Russo committed the offense of harassment under section 42.07(a)(7) of the Penal Code and that it failed to produce any evidence that he stalked Bernal under section 42.072 of the Penal Code by engaging in conduct that he knew or reasonably should have known Bernal would regard as threatening bodily injury, death, or damage to her property.

### Standard of Review

In a legal-sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (citing *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). The record contains more than a mere scintilla of evidence when the evidence rises to a level that would enable reasonable and fair-minded people to

8

differ in their conclusions. *Id.* (citing *King Ranch, Inc.*, 118 S.W.3d at 751). Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion." *Id.* All the record evidence must be considered "in the light most favorable to the party in whose favor the verdict has been rendered," and "every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Bustamante*, 529 S.W.3d at 456 (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

**Bodily injury, death, or damage to her property**

We address first Russo's challenge to the sufficiency of the evidence to support a finding that he stalked Bernal by engaging in conduct that he knew or reasonably should have known Bernal would regard as threatening bodily injury, death, or damage to her property. *See* Tex. Penal Code § 42.072(a). Specifically, Russo challenges the legal sufficiency of the evidence supporting a finding as to the first element of such a stalking offense—i.e., that Russo knowingly engaged in conduct that he knew or reasonably should have known that Bernal would regard as threatening bodily injury, death, or damage to her property.[2] *See id.* § 42.072(a)(1)(A), (C) (making it an offense to, on more than one occasion, knowingly engage in conduct that "the actor knows or reasonably should know that the other person will regard as threatening: bodily injury or death for the other person . . . or [damage to] the other person's property").

---

[2] In his brief, Russo states that he does not challenge the sufficiency of the evidence supporting the second and third elements of the stalking statute. *See* Tex. Penal Code § 42.072(a)(2)–(3).

9

In support of his evidentiary challenge, Russo first emphasizes that there is nothing in the record showing that he ever threatened Bernal or her property; in fact, both Bernal and the other witnesses testified that Russo never made any actual threats to Bernal. But the stalking statute does not require that actual threats be made—it requires conduct that "the other person would regard as threatening." *Id.* § 42.072(a)(1). Further, the stalking is based on a course of conduct, not just one incident, and it is that course of conduct that gives rise to the fear of bodily injury or death. *See id.* § 42.072(a) (requiring "more than one occasion and pursuant to the same scheme or course of conduct").

Russo also asserts that there is no evidence that he possessed the requisite culpable mental state because he could not have known or reasonably believed that Bernal would have regarded his texts and social-media activities as threatening bodily injury or death or damage to her property. Relatedly, Russo argues that, even if he was aware or should have been aware that his activities were causing Bernal distress, such distress was not predictable because all of his conduct towards or regarding Bernal was nonviolent. According to Russo, "liking" and "sharing" Bernal's public social media posts proves nothing because such actions are ubiquitous in our society.

Proof of a culpable mental state generally relies upon circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978); *Johnson v. State*, 932 S.W.2d 296, 303 (Tex. App.—Austin 1996, pet. ref'd). The trier of fact may infer intent from any facts in evidence that tend to prove the existence of the requisite state of mind. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Skillern v. State*, 890 S.W.2d 849, 880 (Tex. App.—Austin 1994, pet. ref'd).

10

Accordingly, Russo's intent may be inferred from his words, actions, and conduct. *See Price v. State*, 410 S.W.2d 778, 780 (Tex. Crim. App. 1967).

Here, the trial court, the factfinder here, was able to review the number and content of Russo's texts and social-media activities admitted into evidence. The trial court also heard Bernal and other witnesses testify about the impact the texts and social-media activity had on Bernal, which we have summarized in the background section above. Further, the trial court heard testimony that Bernal and others, including the APD officer, separately warned Russo to stop his activities related to Bernal. Bernal also testified that she told Russo his behavior was making her uncomfortable and she believed he was stalking her. Finally, there was evidence that Russo had acted violently in connection with Bernal, but not directed at Bernal—i.e., the angry destruction of property and suicidal ideation/threats—and also that Russo had doubts about his ability to stop his behavior related to Bernal. The trial court, as factfinder, could infer from the evidence admitted at trial that Russo knew or should have known that Bernal would regard his actions as threatening bodily injury, death, or damage to her property. *See Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (stating jury may infer intent to kill based on any facts in evidence); *McGowan v. State*, 375 S.W.3d 585, 591 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (concluding that defendant's decision to ignore advice that he leave victim alone revealed defendant's knowledge regarding his conduct and supported conviction for stalking); *Ford v. State*, 152 S.W.3d 752, 756 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("Juries may infer intent from the defendant's conduct and surrounding circumstances.").

We hold that the evidence is legally sufficient to support the trial court's finding that Russo committed the offense of stalking under Section 42.072(a) of the Penal Code.

11

**Harassment**

Russo also argues that there is no evidence that he made repeated electronic communications to Bernal or that if he did, there is no evidence that he intended for those communications to "harass, annoy, alarm, abuse, torment, or embarrass" Bernal. *See* Tex. Penal Code § 42.07(a)(7) ("A person commits an offense if, with the intent to harass, annoy, alarm, abuse, torment or embarrass another, the person . . . sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another."). We need not address this evidentiary challenge, however, because we have upheld the sufficiency of the evidence supporting the other possible stalking finding, which alone provides grounds for a protective order. *See* Tex. Code Crim. Proc. art. 7A.01 (victim of, among other offenses, stalking under section 42.072 of Penal Code may apply for protective order); Tex. Penal Code § 42.072(a) (providing that person commits offense of stalking by either engaging in conduct that constitutes harassment under section 42.07 or by engaging in conduct that the person knows or reasonably should know the other person will regard as threatening bodily injury, death, or property damage).

We overrule Russo's issue.

### Conclusion

Having overruled Russo's issue on appeal, we affirm the trial court's order.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Kelly

Affirmed

Filed: February 12, 2019