**Reverse and Remand in part, Affirm in part; Opinion Filed March 26, 2020**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-17-00719-CV

**JOSE HERNANDEZ, Appellant**

**V.**

**SUN CRANE AND HOIST, INC.; JLB PARTNERS, L.P.; JLB BUILDERS, L.L.C.; AUGER DRILLING, INC.; AND D'AMBRA CONSTRUCTION CORPORATION, Appellees**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-15-00715-D**

## EN BANC OPINION
Before the En Banc Court
Opinion by Justice Carlyle

Jose Hernandez appeals the trial court's order granting summary judgment in

favor of appellee JLB Builders, L.L.C. ("JLB") and ordering that Hernandez take

nothing on his personal injury claims against JLB.[1] On November 1, 2018, a panel

of this court affirmed the trial court's judgment. Hernandez filed a timely motion for

---

[1] Although the trial court's order also granted summary judgment in favor of defendant JLB Partners, L.P., Hernandez asserts in his appellate brief that he appeals "only the summary judgment rendered in favor of JLB Builders, L.L.C." The trial court's rulings regarding Hernandez's claims against the other defendants in this case are not at issue in this appeal.

rehearing, which this court denied. Then, Hernandez filed a motion for en banc reconsideration.

Sitting en banc, we withdraw this court's November 1, 2018 opinion and vacate the judgment of that date.[2] This en banc opinion is now the opinion of the court. We reverse the trial court's order, in part; otherwise affirm the trial court's order; and remand this case to the trial court for further proceedings.

## I. Background

In October 2013, JLB entered into a "Subcontract Agreement" with Capform, Inc. regarding a Dallas construction project. In the Subcontract, JLB was described as "Contractor" and Capform was described as "Subcontractor." The Subcontract stated "[Capform], at its expense, shall furnish all of the supervision, labor, material, tools, equipment, insurance, services, shop drawings, samples, protection, hoisting, scaffolding, supplies, warrantees and all permits . . . necessary to perform, construct, and complete, in the manner set out in the Contract Documents (defined below), the work described in . . . this Agreement (the 'Work')" and is "solely responsible for the acts and omissions of its employees, agents and suppliers and for the acts and omissions of its sub-subcontractors and their employees, agents and suppliers."

---

[2] At this court's request, the parties addressed the issue of this court's jurisdiction regarding en banc reconsideration during oral argument on Hernandez's en banc reconsideration motion. We conclude this court has jurisdiction to reconsider this case en banc. *See Cruz v. Ghani*, No. 05-17-00566-CV, 2019 WL 3282963, at *6 (Tex. App.—Dallas July 22, 2019, order).

The Subcontract provided (1) "[JLB] has no authority to direct, supervise or control the means, manner or method of construction of the Work"; (2) "[Capform] is responsible for the manner and means of accomplishing the Work"; (3) "[i]n the event of a conflict between the terms of this Agreement and other Contract Documents, [Capform] shall be governed by the provisions imposing the greatest duty on [Capform]"; (4) Capform "shall keep a representative on the job site at all times when [Capform's] work is in progress"; and (5) JLB "shall not issue or give any instructions, order or directions directly to employees or workers of [Capform] other than to the persons designated as the authorized representatives of [Capform]." Under the heading "Schedules," the Subcontract stated "[JLB] may, from time to time, provide work schedules or directions to [Capform], which work schedules or directions may from time to time be changed or modified in whole or in part by [JLB], and [Capform] agrees to comply with and perform according to the requirements of any then current work schedules or directions."

The parties attached the initial work schedule as Exhibit D to the Subcontract.[3] That detailed schedule provided piecemeal, day-by-day timelines for completing the work. The next subsection under "Schedules" obligated Capform to check the work schedules and directions posted "on the punch-list board at the Project [site] . . . on

---

[3] We note that JLB did not attach Exhibit D to its summary judgment evidence when it purported to attach the "[r]elevant excerpts from the contract." Hernandez attached the Subcontract and all exhibits thereto to his response.

–3–

a daily basis and conform the Work according to the current work schedules or directions." And the Subcontract required that Capform "shall make [a] crane available at specific times designated by [JLB] for other trades which shall be placed on a schedule in the construction trailer by [JLB]. [JLB] shall not schedule crane at such times as to hamper [Capform's] scope and flow; however, no reasonable request for crane usage may be denied [JLB] from [Capform]. If there ever should be a question as to the validity of a 'reasonable request,' [JLB] shall dictate."

Also, the Subcontract required Capform to submit and comply with an accident prevention and safety program addressing specified safety issues, including fall hazards.[4] Exhibit K to the Subcontract, a three-page document titled "Safety

---

[4] Under the heading "Safety," the Subcontract stated,

(1) Compliance. [Capform] shall fully comply with all laws, orders, citations, rules, regulations, standards and statutes with respect to occupational health and safety, accident prevention, and safety equipment and practices, including without limitation, OSHA standards and any accident prevention and safety program sponsored by Owner or [JLB]. Without limiting the foregoing, simultaneous with the execution hereof, Subcontractor shall complete, execute and deliver to [JLB] an Accident Prevention Plan in the form set forth on EXHIBIT J attached hereto, and shall at all times comply with the requirements of EXHIBIT J and EXHIBIT K attached hereto.

(2) Precautions and Programs.

(a) [Capform] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in its Work and shall conduct inspections to determine that safe working conditions and equipment exist.

(b) [Capform] accepts sole responsibility for providing a safe place to work for its employees and for the employees of its sub-subcontractors and suppliers, and for the adequacy and required use of all safety equipment.

(c) Prior to the commencement of the Work, [Capform] shall submit its site specific safety program to [JLB]. [Capform's] safety program must specifically address, among other safety issues, scaffolding, fall hazards, trenching and shoring, as may be applicable.

–4–

Requirements," contained general safety requirements and obligated Capform to follow established law, but it also contained certain job-specific requirements, such as, "Subcontractor shall specifically abide by and strictly comply with the following: . . . Use safety harnesses when working in areas not protected by handrails." [5]

On December 5, 2013, Hernandez was a member of a Capform work crew supervised by Capform foreman Alejandro Molina. Hernandez was injured on the project site when he fell from a "rebar cage" while attempting to place on the cage a concrete form suspended from a crane. He filed negligence and gross negligence claims against JLB.

JLB filed a traditional and no-evidence motion for summary judgment on both claims. JLB's motion stated it was based on two grounds: (1) JLB owed no duty to Hernandez because he was an employee of an independent contractor and JLB did not exercise actual control over his work or have a contractual right to control the means, methods, or details of his work, and (2) JLB did not proximately cause Hernandez's alleged injuries.[6] The evidence attached to JLB's motion included excerpts from the Subcontract and depositions of Hernandez and Capform superintendent Juan Gutierrez, Molina's supervisor.

---

[5] JLB failed to attach Exhibit K to its summary judgment motion but Hernandez submitted it with his response.

[6] Additionally, in the argument section of its summary judgment motion, JLB asserted, "Plaintiff cannot provide any evidence to support the negligence elements of duty, breach, and causation." On appeal, JLB does not address the element of breach.

In those deposition excerpts, Gutierrez testified (1) he is "the one who's in charge of what work that Capform employees are doing on a daily basis"; (2) no one from JLB told him "how to install the braces" on the rebar cage that fell; and (3) "no one from JLB has to tell us how to do the job." Hernandez testified (1) on the day of the accident, Molina told Hernandez he would be setting the form on the cage; (2) it was not "windy" that day; (3) JLB did not give Hernandez any instructions regarding how to set the form or tell Hernandez to get up on the cage that fell; and (4) he did not see anyone from JLB "on this job on the day of the accident before it occurred." Also, Hernandez replied "I don't know" in response to questions regarding whether anyone from JLB knew bracing for the rebar cage had been attached to the ground with nails instead of rebar, whether Hernandez had any reason to believe JLB caused the accident, and whether Capform installed the braces on the cage.

Hernandez filed a response to JLB's summary judgment motion in which he asserted (1) the day of the accident "was a windy day"; (2) "[t]he windy conditions were not ideal for either working on the double stack tower, or for lowering the concrete form by crane"; (3) "[JLB's] supervisors were onsite and knew of the hazards which workers were facing"; (4) "the subcontractor had been instructed by the General Contractor, JLB Builders, to go ahead with efforts to get the rebar tower and concrete form in place in order to be able to pour concrete later that day"; (5) "[a]s the crane lowered the concrete form onto the tower, the tower either swayed, or was contacted by the concrete form" and "it was evident that none of the

bracing . . . could keep the double size rebar tower in place"; and (6) as the cage began to fall, Hernandez "scrambled desperately to jump free of the tower as it fell, but it landed on his legs, causing multiple fractures." Hernandez contended JLB "exercised full control of the schedule, including its decision to schedule the crane for different phases of the project," "had contractual authority to control the details of Capform's work, including accident prevention and safety," and "breached its duty to assure safe working conditions for Mr. Hernandez," which "lead directly" to his injuries.[7] The evidence attached to Hernandez's summary judgment response included (1) affidavits of Hernandez and Molina; (2) the Subcontract; (3) JLB

---

[7] Specifically, Hernandez contended in his summary judgment response,

> [JLB] was the general contractor and controlling employer for work on the site, and was in charge not only of scheduling, and work progress at the site, but contractually required Capform and Mr. Hernandez to follow the safety rules and procedures in the JLB Health and Safety Manual. JLB Builders also required Capform to submit a separate safety program for JLB Builders' approval, which JLB mandated include a "fall hazard" component. JLB Builders followed up on its contractual authority by instructing Capform at times concerning its work methods, conducting daily site inspections, conducting regular safety meetings that Capform was required to attend, and also attending Capform's meetings. JLB Builders also contracted with an outside provider to perform regular safety audits of the site, covering the smallest details of the project, and following up to instruct subcontractors such as Capform to make changes based on the audits.
> . . . .
> Mr. Hernandez presented ample evidence that the JLB Defendants breached their standard of care by: failing to assure that the rebar tower was properly braced; failure to assure that proper braces were not [sic] used; insisting that work continue despite the presence of high winds, or failing to stop the work despite the presence of high winds; failing to warn Mr. Hernandez of the hazards associated with the inadequate bracing and high winds. There is also ample record evidence that the failure to adequately brace the tower was a contributing cause of the accident, and that requiring the work to continue in the high winds was a cause of the accident.

Partners, L.P.'s 170-page "Health & Safety Manual"; and (4) excerpts from depositions of Gutierrez and JLB corporate representative Paul Johnston.

Johnston testified in his deposition (1) on the day of the injury, JLB supervisory employees were on the site; (2) JLB's supervisory employees "were aware that these towers could be knocked over or fall over if not properly braced or if a big, strong wind came along or if the crane hit them"; (3) JLB "inspects for safety every day"; and (4) JLB had "the authority to correct any unsafe condition," "the responsibility to enforce subcontractors' compliance with safety and health requirements," and "an obligation to exercise reasonable care to prevent and detect violations at its construction sites" and "implement an effective system for promptly correcting hazards."

Gutierrez testified in his deposition (1) he made the decision that "the form should be lifted and lowered to the cage and closed by [crew members]" rather than being placed on the cage by some other method; (2) he believes a "brace" on the rebar cage "came loose" from the ground because "a correct bracing was not used" by the foreman, Molina; and (3) he "explained to the foreman to use rebar," rather than nails, to brace the cage, but "they didn't do what I told them." Also, Gutierrez stated,

> Q. Would it have been possible for the form to have been stood up, lifted just a short distance off the ground, then closed, then lifted and placed around the cage?

A. Yes. It's possible. And we tried to do that. But on windy days, it's difficult to place the cage over the rebar. There's a greater risk of knocking the rebar over.

. . . .

Q. Did anyone you spoke to tell you it was too windy to place the form around the rebar while it was closed?

A. No.

. . . .

Q. And isn't it true that if the form is open there is more surface that the wind can catch and—and blow on?

A. Correct.

. . . .

Q. And it's—it's fair to say that no one from JLB told you how to install the braces?

A. No. As I said awhile ago, JLB has no reason to tell us how, unless they see something that's unsafe. They can tell me.

. . . .

Q. And I think we've established that you weren't aware that nails were used to install the braces, right?

A. Correct.

Q. So if you didn't know, there would be no reason for JLB to know that?

A. Correct.

. . . .

Q. Do you recall that it was windy that day?

A. I—I don't remember very well, but it's possible that there was some wind.

Q. If wind was making it difficult to set the column, is that something that either you or Mr. Molina had the right to stop until it was safer?

A. We could have, but—but I don't know if it was a wind that was over 45 miles an hour. And even the [crane] operator has the right to say no.

Q. In your experience, how does wind affect a crew's ability to set a column?

A. Well it affects it, as I said, if it's above 20, 25 miles an hour. If it's less, it affects something, but it's—but we can—have to continue work.

Hernandez stated in his affidavit (1) "JLB observed how we did our work in the days before I was injured" and (2) "[i]n the days before my injuries, I saw JLB supervisors looking at . . . the wooden supports (or legs)" on the rebar cage in question.

Molina stated in his affidavit,

> The bottoms of the bracing for the rebar cage that fell over were secured by driving long nails through the bottom into the ground. That is a normal and acceptable method of securing the bottom of the bracing, and one that we and other Capform personnel had used in other situations and on other jobsites.
> . . . .
> On the day Mr. Hernandez was injured, it was windy. The wind speed, in my estimation was about 15–25 miles per hour. I personally saw the whole operation and what happened when the rebar cage fell. After the carpenters, including Mr. Hernandez, opened the form, the crane operator moved the form toward the rebar cage. The momentum of the concrete form caused by the crane operator made the form strike the rebar cage and cause it to start falling over. . . . I yelled to the carpenters to jump off, but it was too late. They were tied onto the rebar cage with their safety harnesses.

## II. Summary judgment

In two issues, Hernandez asserts the trial court erred by granting no-evidence and traditional summary judgment on his negligence claim against JLB.[8] We agree.

---

[8] Although the trial court's summary judgment addressed "all" of Hernandez's claims against JLB, Hernandez asserts no error on appeal regarding his gross negligence claim. Therefore, the issue of whether

## A. Standard of review

We review a trial court's decision to grant summary judgment de novo. *Tarr v. Timberwood Park Owners Ass'n, Inc.,* 556 S.W.3d 274, 278 (Tex. 2018). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *Id.*; TEX. R. CIV. P. 166a(c). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary judgment evidence. *Lam v. Phuong Nguyen*, 335 S.W.3d 786, 789 (Tex. App.—Dallas 2011, pet. denied); *Top Cat Ready Mix, LLC v. Alliance Trucking, L.P.*, No. 05-18-00175-CV, 2019 WL 275880, at *2 (Tex. App.—Dallas Jan. 22, 2019, no pet.) (mem. op.). A defendant is entitled to summary judgment on a plaintiff's claim if it conclusively negates at least one element of the cause of action. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *see also Lam*, 335 S.W.3d at 789 (explaining matter is conclusively established if reasonable people could not differ as to conclusion to be drawn from evidence).

A party seeking a no-evidence summary judgment must assert that no evidence exists as to one or more essential elements of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). The burden then shifts to the nonmovant to raise a fact issue on the challenged

___

summary judgment was proper as to that claim presents nothing for this court's review. *See* TEX. R. APP. P. 38.1(f), (i).

elements. *Id.* We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See id.*; *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). A no-evidence motion for summary judgment is improperly granted if the nonmovant presented more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged elements. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* at 601. "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Id.*

In reviewing a summary judgment of either type, we consider the evidence "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (per curiam) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). If a no-evidence motion for summary judgment and a traditional motion for summary judgment are filed that respectively assert the plaintiff has no evidence of an element of its claim and alternatively assert the movant has conclusively negated that same element of the claim, we address the no-evidence motion for summary judgment first. *Ford Motor Co.*, 135 S.W.3d at 600. Where, as here, the trial court's order granting summary judgment does not specify the grounds

relied on, we must affirm if any of the summary judgment grounds are meritorious. *Cunningham v. Tarski*, 365 S.W.3d 179, 186 (Tex. App.—Dallas 2012, pet. denied).

## B. Applicable law

To prevail on a negligence claim, a plaintiff must establish a legal duty, a breach of that duty, and damages proximately caused by the breach. *See Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017). Ordinarily, a general contractor does not owe a duty to ensure that an independent contractor performs its work in a safe manner. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). However, when the general contractor exercises some control over the manner in which the subcontractor's work is performed, he may be liable unless he exercises reasonable care in supervising the subcontractor's activity. *Id.*; *see also Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). The general contractor's duty of care is commensurate with the control it retains over the independent contractor's work. *Lee Lewis Constr.*, 70 S.W.3d at 783. A general contractor can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control. *Id.*

General supervisory control that does not relate to the activity causing the injury is not sufficient to create a duty. *Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 785 (Tex. App.—Dallas 2013, no pet.). Thus, merely exercising or retaining a general right to recommend a safe manner for the independent contractor's

–13–

employees to perform their work is not enough to impose a duty. *Id.*; *see also Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 611 (Tex. 2002) ("[M]ere promulgation of safety policies does not establish actual control."); *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex. 1999) (per curiam) (explaining that requiring independent contractor to "observe and promote compliance with federal laws, general safety guidelines, and other standard safety precautions [does] not impose an unqualified duty of care on [an employer] to ensure that [an independent contractor's employees do] nothing unsafe"). In addition, there must be a nexus between a general contractor's retained supervisory control and the condition or activity that caused the injury. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357–58 (Tex. 1998) (per curiam). The right to control must be more than a general right to order work to stop and start, or to inspect progress. *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (per curiam). The supervisory control must relate to the activity that actually caused the injury and grant the general contractor at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner. *Id.*

In order to have actual control, a general contractor "must have the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor is not entirely free to do the work his own way," and the "right to control the work must extend to the 'operative detail' of the contractor's work." *Union Carbide Corp. v. Smith*, 313 S.W.3d 370, 375 (Tex.

App.—Houston [1st Dist.] 2009, pet. denied) (quoting *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)). "A possibility of control is not evidence of a 'right to control' actually retained or exercised." *Hernandez v. Hammond Homes, Ltd.*, 345 S.W.3d 150, 155 (Tex. App.—Dallas 2011, pet. denied) (quoting *Coastal Marine*, 988 S.W.2d at 226 (explaining that evidence plaintiff would have followed safety measures and avoided injury if defendant had required them was no evidence of actual control)). A general contractor has actually exercised control of a premises when the general contractor knew of a dangerous condition before an injury occurred and approved acts that were dangerous and unsafe. *Dow Chem.*, 89 S.W.3d at 609 (citing *Lee Lewis Constr.*, 70 S.W.3d at 784).

The two elements of proximate cause are cause in fact and foreseeability. *Bustamante*, 529 S.W.3d at 456. Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries and, without it, the harm would not have occurred. *Id*. Harm is foreseeable if a person of ordinary intelligence should have anticipated the danger created by an act or omission. *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018). The exact sequence of events need not be foreseeable, but the conduct must be sufficiently similar to give the defendant notice of the general nature of the danger. *Id*.

## C. Analysis

Hernandez contends the trial court erred by granting no-evidence and traditional summary judgment on his negligence claim because the evidence shows JLB owed a duty to keep him safe, breached that duty by "permitting and instructing Capform to work under dangerous conditions," and thereby proximately caused his injuries. Hernandez argues JLB's duty was based on both contractual control and the exercise of actual control. Additionally, as he had in his motion for panel rehearing, Hernandez notes in his motion for reconsideration en banc that this court's November 1, 2018 opinion failed to address two cases pertaining to subcontractor control and predating that opinion: *Arredondo v. Techserv Consulting & Training, Ltd.*, 567 S.W.3d 383 (Tex. App.—San Antonio 2018, pet. pending), and *Morales v. Alcoa World Alumina L.L.C.*, No. 13-17-00101-CV, 2018 WL 2252901 (Tex. App.—Corpus Christi–Edinburg May 17, 2018, pet. denied) (mem. op.).[9]

---

[9] Although *Arredondo* and *Morales* involved the same legal principles applicable in this case and support our conclusions below, neither this opinion nor our decision to reconsider this case en banc is dependent on those cases. In determining whether en banc reconsideration is warranted, we are not limited to considering only the bases urged by appellant's en banc reconsideration motion. *See* TEX. R. APP. P. 49.7 ("While the court has plenary power, a majority of the en banc court may, with or without a motion, order en banc reconsideration of a panel's decision."). The original panel's analysis omits any mention of (1) the Subcontract provisions described above regarding schedule control and mandatory safety harness use; (2) Johnston's testimony that JLB supervisory employees were on-site on the day of the accident and knew the cage could fall over in the event of strong wind or improper bracing; (3) Hernandez's testimony that he saw JLB supervisors looking at the cage's bracing prior to the accident; and (4) Molina's statements that the wind speed was 15–25 miles per hour on the day of the accident and Hernandez was told to jump, but was tethered to the cage by his safety harness.

Those omissions demonstrate that the original panel's opinion represents a serious departure from precedent in the review of no-evidence summary judgment cases and therefore warrants en banc review under Texas Rule of Appellate Procedure 41.2 to "secure or maintain uniformity of the court's decisions." TEX. R. APP. P. 41.2; *see In re V.V.*, 349 S.W.3d 548, 606 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also Kennamer v. Estate of Noblitt*, 332 S.W.3d 559, 571 (Tex. App.—Houston [1st Dist.]

## 1. Duty based on actual exercise of control

Hernandez contends JLB owed him a safety duty based on actual control because JLB exercised "precisely the type of detailed, hands-on control contemplated" in *Lee Lewis Construction* and *Morales*. JLB responds,

> [T]o establish actual control, the evidence must be such that the general contractor or property owner was so involved in the work being performed that it can be said to have approved the dangerous act leading to injury. . . . There is no such evidence here. In fact, Capform's supervisor specifically testified that JLB did not tell him how to brace the tower the day of Appellant's injury and did not approve the way in which it was done. Appellant Hernandez himself testified that JLB did not give him any instructions on how he was to set the form or platform on the day of the accident, and could not even identify any way in which JLB, who did not even have anyone present the day of the accident, was negligent in connection with the accident.

(citations omitted).

In *Lee Lewis Construction,* the supreme court upheld a jury's finding that a general contractor was liable for the death of an independent contractor's employee who fell from a ten-story building when his safety support system failed. *Lee Lewis Constr.*, 70 S.W.3d at 782. The supreme court focused on the evidence showing the general contractor assigned a superintendent "the responsibility to routinely inspect

---

2009, pet. denied) (Keyes, J., dissenting) (stating en banc review was warranted because the panel "reads *City of Keller* as requiring it to weigh the evidence for itself and to determine whether reasonable people could differ with its own judgment," "misapplies the summary judgment rule in a way that . . . distorts summary judgment practice within the jurisdiction of this Court," and "wrongfully encourages parties to file summary judgment motions on fact issues as to which there is conflicting evidence in the hope that this Court, following its own precedent, will determine that no reasonable person could disagree with its own determination of disputed facts, transforming summary judgment practice from a means of disposing of cases that present only legal issues to a means of trying material fact issues by selected proofs submitted to the court").

the ninth and tenth floor addition to the south tower to see to it that the subcontractors and their employees properly utilized fall protection equipment." *Id*. at 784. Further, the supreme court noted the evidence demonstrating the superintendent personally witnessed and approved of the specific fall-protection systems used by the independent contractor. *Id*. In that case, the supreme court concluded the evidence was "more than scintilla of evidence that [the general contractor] retained the right to control fall-protection systems on the job site." *Id*.

*Morales* involved a plaintiff injured in an industrial accident while employed by a contractor, Turner. *See Morales*, 2018 WL 2252901, at *1. Turner was under contract with Alcoa to provide maintenance and repair services at an Alcoa alumina refining facility. Morales contended Alcoa negligently failed to ensure that all of the "process liquor," a chemical solution, was cleared out of a pipe, called a "riser," before giving the Turner crew orders to begin their work. Also, Morales alleged Alcoa had actual knowledge that the riser "was not isolated" from the liquor flow. *Id*. When Turner employees began their work, hot liquor sprayed out of the riser, burning Morales. *Id*. The trial court granted summary judgment in favor of Alcoa on Morales's negligence claims and Morales appealed. The court of appeals reversed, concluding the evidence raised a fact issue concerning whether Alcoa exercised control over the manner in which the work was performed. The court stated (1) the work Turner was hired to do "necessarily entails the unbolting of flanges"; (2) the evidence showed Alcoa required Turner to perform that task according to

–18–

instructions contained in the "Standard Work Instruction form," a twelve-page Alcoa document containing detailed guidelines on "how Alcoa's contractors must perform flange breaks,"; (3) "[m]oreover, it is undisputed that [Alcoa] exercised actual and exclusive control over the verification process, including the proper flushing and draining of the risers, and that the Turner crew relied on [Alcoa's] performance of this activity"; and (4) "[a]ccordingly [Alcoa] exercised 'some control' over the 'operative details' of 'the work.'" *Id.* at \*10; *see also Enserch Corp. v. Parker*, 794 S.W.2d 2, 6 (Tex. 1990) (concluding fact question regarding control was raised where contract gave general contractor "the right to order work changes in the nature of additions, deletions, or modifications" and general contractor provided specific procedure manual, frequently visited site, and supervised subcontractor's employees).

Here, we are presented a different cluster of factors but one that reveals a fact issue nonetheless. In this case, JLB's Johnston testified (1) JLB "inspects for safety every day"; (2) on the day Hernandez was injured, JLB supervisory employees were on the site; and (3) JLB's supervisory employees "were aware that these towers could be knocked over or fall over if not properly braced or if a big, strong wind came along or if the crane hit them." The mere presence of a JLB safety employee (or employees) would not create sufficient control for JLB to have owed a duty. *See Koch*, 11 S.W.3d at 157 ("We conclude that a premises owner, merely by placing a safety employee on the work site, does not incur a duty to an independent

contractor's employees to intervene and ensure that they safely perform their work."). But there is evidence JLB retained control over the daily schedule, the order in which the work was to be done, the mandatory use of safety harnesses, and when the crane would be on-site. And some evidence suggests there was sufficient wind that day to have made the work more dangerous and JLB knew of the wind and the increased danger.[10] Thus, we conclude there is more than a scintilla of evidence that JLB owed Hernandez a duty arising from actual exercise of control. *See Lee Lewis Constr.*, 70 S.W.3d at 784 (concluding evidence supported actual control where on-site superintendent overseeing mandatory use of fall-protection equipment witnessed and approved of contractor's fall-protection systems); *Morales*, 2018 WL 2252901, at *10 (concluding evidence raised fact issue regarding duty where owner provided performance guidelines and controlled draining process necessary to contractor's work); *see also Hoechst-Celanese*, 967 S.W.3d at 357–58. Additionally, we conclude reasonable and fair-minded jurors could differ in their conclusions regarding JLB's actual exercise of control. *See Lee Lewis Constr.*, 70 S.W.3d at 782–84; *Morales*, 2018 WL 2252901, at *10; *Hoechst-Celanese*, 967 S.W.3d at 357–58; *see also Lam*, 335 S.W.3d at 789. Therefore, the trial court erred to the extent it granted summary judgment in JLB's favor based on lack of duty arising from actual

---

[10] We reject Justice Bridges's suggestions that this opinion will encourage general contractors to "completely distance themselves from any efforts to assure safety on their work sites." We do no more than address "all" admitted evidence and conclude the trial court—on these specific, unique facts—incorrectly granted summary judgment. *See City of Keller*, 168 S.W.3d at 810–11 (beginning with the propositions that the relevant inquiry is "fact specific" and is based on the evidence jurors heard).

exercise of control. In light of that conclusion, we need not address contractual control.

2. Breach and proximate cause

Hernandez contends JLB breached its duty of care to him because it "did not exercise reasonable care in supervising the subcontractor's activity" and "[i]n fact, . . . insisted on Capform employees continuing to conduct a dangerous activity in dangerous conditions." Also, he asserts there was "ample evidence in the record demonstrating that [JLB's] decisions were an actual and foreseeable cause of the incident." He argues (1) "[b]ut for JLB's insistence that work continue under dangerously windy conditions, [he] would not have fallen"; (2) "[a]s a result of [JLB's] negligence, [he] fell from the tower and sustained serious injuries"; and (3) he "attempted to jump free of the tower as it fell, but it landed on his legs."

Based on the same evidence described in the duty analysis above, we conclude there is more than a scintilla of evidence that (1) JLB breached its duty of care by not exercising reasonable care in supervising Capform's activity, *see Lee Lewis Constr.*, 70 S.W.3d at 783 (stating that when general contractor exercises some control over manner in which subcontractor's work is performed, he may be liable unless he exercises reasonable care in supervising subcontractor's activity), and (2) JLB's act or omission proximately caused Hernandez's injury; *see Guevara v. Ferrer*, 247 S.W.3d 662, 666–67 (Tex. 2007) (explaining that evidence establishing sequence of events that provides strong, logically traceable connection between

–21–

event and condition suffices to support causation finding). Additionally, under the traditional summary judgment standard of review described above, we conclude reasonable and fair-minded jurors could differ in their conclusions regarding breach and proximate cause. *See Lee Lewis Constr.*, 70 S.W.3d at 783; *Guevara*, 247 S.W.3d at 667. Therefore, the trial court erred to the extent it granted summary judgment in JLB's favor based on lack of breach or proximate cause. *See Lam*, 335 S.W.3d at 789; *Ford Motor Co.*, 135 S.W.3d at 601.

### III. Conclusion

We decide Hernandez's two issues in his favor.[11] We reverse the portion of the trial court's order granting summary judgment in favor of JLB on Hernandez's negligence claim, otherwise affirm the trial court's order, and remand this case to the trial court for further proceedings consistent with this opinion.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Bridges, J., dissenting joined by Myers, Whitehill, Schenck, and Evans, JJ.

Whitehill, J., dissenting from en banc reconsideration joined by Bridges, Myers, Schenck, and Evans, JJ.

170719F.P05

---

[11] Although the dissent addresses the evidence omitted from the original panel's opinion, the dissent's analysis in reaching its "no-evidence" conclusions disregards our obligation under the applicable standard of review to consider the evidence "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the [summary judgment] motion." *Sudan*, 199 S.W.3d at 292 (quoting *City of Keller*, 168 S.W.3d at 823). The inferences indulged in this opinion's analysis are proper and cannot be rejected merely because they conflict with the dissent's own determination of disputed facts. *See id.*



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSE HERNANDEZ, Appellant

No. 05-17-00719-CV          V.

SUN CRANE AND HOIST, INC.;
JLB PARTNERS, L.P.; JLB
BUILDERS, L.L.C.; AUGER
DRILLING, INC.; AND D'AMBRA
CONSTRUCTION
CORPORATION, Appellees

On Appeal from the County Court at
Law No. 4, Dallas County, Texas
Trial Court Cause No.
CC-15-00715-D.
Opinion delivered by Justice Carlyle,
before the Court sitting en banc.

We **WITHDRAW** our opinion and **VACATE** our judgment of November 1, 2018. This is now the judgment of the Court.

In accordance with this Court's opinion of this date, we **REVERSE** the portion of the trial court's order granting summary judgment in favor of appellee JLB Builders, L.L.C. on appellant Jose Hernandez's negligence claim; otherwise **AFFIRM** the trial court's order; and **REMAND** this case to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant Jose Hernandez recover his costs of this appeal from appellee JLB Builders, L.L.C.

Judgment entered this 26th day of March, 2020.